**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Shane Young,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:22-cv-50222** |
| | ) | |
| **Experian Information Solutions, Inc.,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Shane Young ("Young") applied for a job at Walmart. His application stalled, however, when a background check ordered by Walmart showed that the Social Security number ("SSN") Young was using was listed by the Social Security Administration ("SSA") as registered to a deceased individual. But Young was in fact using his own, valid SSN, and the SSA's records contained an error. In this action, Young has sued Experian Information Solutions, Inc. ("Experian") under the Fair Credit Reporting Act ("FCRA"). Young alleges that Experian failed to use reasonable procedures in reporting information about him to third-party First Advantage ("FADV") and failed to reasonably reinvestigate once Young disputed its reporting.

Both sides have moved for summary judgment [135] [143]. As explained below, Experian's motion is granted with respect to Young's "reasonable procedures" claim but denied with respect to his "reasonable reinvestigation" claim. Young's motion is denied in full.

## BACKGROUND

### I. Statutory Background: The Fair Credit Reporting Act

Congress enacted the FCRA, codified at 15 U.S.C. § 1681 et seq., "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Chaitoff v. Experian Info. Sols., Inc.*, 79 F.4th 800, 809 (7th Cir. 2023) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)). In service of those goals, the statute demands that consumer reporting agencies ("CRA") "exercise their grave responsibilities with fairness,

impartiality, and a respect for the consumer's right to privacy." *Chaitoff*, 79 F.4th at 809 (quoting 15 U.S.C. § 1681(a)(4)). The statute defines a CRA as:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

§ 1681a(f). Defendant Experian is well recognized as one of the three major CRAs in the United States. *See Chaitoff*, 79 F.4th at 810.

The FCRA is not a strict liability statute. *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 608 (7th Cir. 2005). Rather, § 1681e of the FCRA requires that CRAs "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *Chaitoff*, 79 F.4th at 809. "Accuracy" is not defined in the statute, "but it has long been understood that the term encompasses both truth and completeness—a report that is misleading or materially incomplete is inaccurate." *Id.* (internal citations omitted).

"When a consumer contends that his credit report is inaccurate or incomplete, he can dispute his report with the CRA that prepared it." *Id.* The consumer may also initiate the dispute indirectly through a "reseller." § 1681i(a)(1)(A). A reseller is any CRA that (1) "assembles and merges information contained in the database of another [CRA] or multiple [CRAs] concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities"; and (2) "does not maintain a database of the assembled or merged information from which new consumer reports are produced." § 1681a(u). Experian, which generates its own credit reports, is not a "reseller." (*See* Def. Local Rule 56.1 Statement of Undisputed Material Facts [136] (hereinafter "DSOF") ¶ 8.) As the court will explain in more detail below, however, FADV— which acquires information from Experian and includes it in background reports prepared

for customers like Walmart—does appear to fall into this category. (*See* Pl. Local Rule 56.1 Statement of Undisputed Material Facts [144] (hereinafter "PSOF") ¶ 3.)

Once a CRA is notified of a dispute, it is obligated to conduct, free of charge, a "reasonable reinvestigation to determine whether the disputed information is inaccurate," considering all "relevant information submitted by the consumer." *Chaitoff*, 79 F.4th at 809 (quoting §§ 1681i(a)(1)(A), (a)(4)). A CRA "may terminate a reinvestigation of information disputed by a consumer . . . if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information." § 1681i(3)(A). If the dispute is not frivolous, however, the CRA must, within 30 days of receiving notice, either "record the current status of the disputed information" or, if the disputed information is found to be inaccurate or incomplete or cannot be verified, delete that item from the consumer's file. §§ 1681i(a)(1)(A), (5)(A). If the CRA receives additional information from the consumer during the 30-day window "that is relevant to the reinvestigation," the window "may be extended for not more than 15 additional days," § 1681i(a)(1)(B), but that 15-day extension is available only if the CRA has not already found that the information must be corrected. *See* § 1681i(a)(1)(C) (15-day extension "shall not apply to any reinvestigation in which, during the 30-day period described in [§ 1681i(a)(1)(A)], the information that is the subject of the reinvestigation is found to be inaccurate or incomplete or the consumer reporting agency determines that the information cannot be verified.")

"If the reinvestigation does not resolve the dispute," § 1681i(b) allows a consumer to "file a brief statement setting forth the nature of the dispute." *Chaitoff*, 79 F.4th at 809. In response to such a statement, unless there are "reasonable grounds to believe that it is frivolous or irrelevant," the CRA "shall, in any subsequent consumer report containing the information in question, clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof." *Id.* (quoting § 1681i(c)).

3

Where a CRA has negligently violated any duty imposed by the FCRA, the plaintiff may collect actual damages, costs, and fees. *Ruffin-Thompkins*, 422 F.3d at 607 (citing §§ 1681n, 1681o). If the CRA commits a "willful violation," the consumer may also recover punitive damages. *Id.*

## II.     Factual Background

The events underlying this case were precipitated by an error in the federal government's data: in at least one of its databases, called the Limited Access Death Master File ("LADMF"), the government listed the very-much-alive Plaintiff, Shane Young, as being deceased. After Young applied for a job at Walmart and provided his SSN as part of a background check, the government's erroneous data reached Walmart through a game of telephone: Walmart asked FADV to conduct the background check, FADV asked Defendant Experian to verify Young's SSN, and Experian referenced Young's SSN against the LADMF, which showed that Young's SSN was registered to a deceased individual. Experian then reported this information to FADV as a potential warning sign that the applicant (Young) was committing identity fraud, and FADV passed the information along to Walmart. Young claims that Walmart then "denied [his] employment because it believed there were fraud concerns surrounding [him] and/or his identity," (Pl. Mem. [145] at 7), but the court notes that he offers no non-hearsay evidence of the reason(s) Walmart did not hire him. The court elaborates on each step in the process below, before describing how Young eventually engaged with Experian in hopes of resolving the issue.

### A.     The LADMF

The LADMF is a database that "contains over 83 million records of deaths that have been reported to the SSA," including "the individual's social security number, first name, middle name, surname, date of birth, and date of death." U.S. NAT'L TECH. INFO. SERV., *Limited Access Death Master File Download*, https://dmf.ntis.gov/index.php (last visited Mar. 18, 2025); (DSOF ¶ 2.) The LADMF is maintained and distributed, in collaboration with SSA, by the National Technical Information Service ("NTIS"), a bureau within the U.S. Department of Commerce whose mission,

4

in part, is "making Federal information and data available to American businesses and the Public." U.S. NAT'L TECH. INFO. SERV., *About Us*, https://www.ntis.gov/about/about-us.xhtml (last visited Mar. 28, 2025).

The LADMF is available only to entities that have been certified by NTIS: In order to qualify as "certified persons," also known as "Subscribers," the entities must have a legitimate fraud prevention interest, or have a legitimate business purpose pursuant to a law, governmental rule, regulation, or fiduciary duty. U.S. NAT'L TECH. INFO. SERV., *Limited Access Death Master File ("LADMF")*, https://www.ntis.gov/ladmf/ladmf.xhtml (last visited Mar. 28, 2025); *see also* U.S. NAT'L TECH. INFO. SERV., *Limited Access Death Master File Download*, https://dmf.ntis.gov/index.php (last visited Mar. 28, 2025) (the LADMF "is used by leading financial and credit firms as well as government agencies to match records and prevent identity fraud.") NTIS continually updates the LADMF with newly reported deaths, and NTIS makes the updated versions of the database available to Subscribers. *See* U.S. NAT'L TECH. INFO. SERV., *Limited Access Death Master File Weekly Updates*, https://dmf.ntis.gov/weekly/ (last visited Mar. 18, 2025); U.S. NAT'L TECH. INFO. SERV., *Limited Access Death Master File Monthly Updates*, https://dmf.ntis.gov/monthly/ (last visited Mar. 28, 2025).

The LADMF is not infallible. First, it is not a complete list of all United States death records; because the SSA does not have death records for all persons, the absence of a particular person's name in the LADMF is not proof that the person is alive. U.S. NAT'L TECH. INFO. SERV., *Limited Access Death Master File Download*, https://dmf.ntis.gov/index.php (last visited Mar. 28, 2025). Further, as NTIS communicates in the user agreement distributed to Subscribers, "in rare instances, it is possible for the records of a person who is not deceased to be included erroneously" in the LADMF. (PSOF ¶ 32.)

When an individual asserts that the LADMF has incorrectly listed them as deceased, NTIS requires that Subscribers follow a particular protocol. (DSOF ¶ 6.) The Subscriber should direct the individual to contact their local Social Security office and provide information necessary to

have the error corrected. (*Id.*) Once the error is corrected in the SSA's "main" version of the LADMF, the local Social Security office should provide the individual with a document verifying the correction. (*Id.*) The Subscriber should accept proof from the individual—either the individual's own records or the verification from the local Social Security office—and correct its "local" copy of the LADMF. (*Id.*) The Subscriber should also notify any organizations to which it sold information from the LADMF that the correction needs to be made. (*Id.*) Finally, NTIS warns that Subscribers "should not take any adverse actions against any individual without further investigation to verify the death listed." (DSOF ¶ 7.) NTIS also requires that if the Subscriber is "making available/selling SSA's DMF information to others," the Subscriber "must also provide them with a copy of the NTIS's requirements for Subscribers." (*Id.*)

## B. Experian and Fraud Shield

Experian is an LADMF Subscriber. (DSOF ¶ 14; Methvin Decl. [136-1] ¶¶ 9–11, Strickland Decl. [136-2] ¶ 9.) As a Subscriber, Experian receives continuous updates to the LADMF on a weekly basis and has the ability to run queries against the database. (Strickland Decl. ¶¶ 10.)

In addition to producing credit reports, Experian sells a product suite known as Fraud ShieldSM ("Fraud Shield"), which assists the purchaser in detecting identity theft. (DSOF ¶ 8.) Experian markets Fraud Shield as "a first line of defense" that enables the client "to instantly and specifically recognize the warning signs of potential fraud." (*Id.* ¶ 12; *see also* Fraud Shield Product Sheet [136-5] at 1.) These warning signs, or "indicators," are identified by Experian based on the information submitted for a particular person: one of the indicators, titled "Input SSN recorded as deceased," is created by Experian comparing SSNs against the LADMF. (DSOF ¶¶ 1, 3, 9.) Both parties refer to this datapoint—the consumer being recorded as deceased—as a "deceased notation." (*See, e.g.*, PSOF ¶¶ 16–18, DSOF ¶¶ 31, 34.) Deceased notations are also reflected in a consumer's Experian credit reports. (*See* PSOF ¶¶ 37–38.)

In addition to relying on LADMF records, Experian may add a deceased notation to a consumer's file based on information in a consumer's credit account (or "tradeline") that was

6

reported to Experian by the creditor. (*Id.* ¶ 37.) Experian recognizes the possibility of erroneously recorded deaths in tradelines, however, and uses a computer program called a "deceased scrub" to address these errors. (*Id.*) The deceased scrub program, which operates on a continual basis, evaluates a consumer's credit file for ongoing activity like new accounts, new inquiries and new payments—if the scrub detects such activity taking place *after* the date of the tradeline deceased notation, Experian's system understands the consumer is not actually deceased and removes the notation. (*Id.*) Significantly, however, Experian does not use the deceased scrub program to remove deceased notations originating from the LADMF. (*See id.* ¶ 38; Methvin Dep. [146-2] at 147:10–11.)[1] Mary Methvin, a Senior Compliance and Litigation Analyst at Experian, testified at her deposition that, where a death is reported in the LADMF, Experian will "not remove that notice" without "a letter from" the SSA. (Methvin Dep. at 147:11–14.)

### C.     Young's Job Application with Walmart and Background Check

On April 19, 2022, Young completed an application for employment with Walmart and consented to a background report to be prepared by FADV as part of the application process. (PSOF ¶ 1.) The first phase of FADV's background reports prepared for Walmart includes a Social Security Verification ("SSNV"). (*Id.* ¶ 3.) In order to complete the SSNV, FADV requests and obtains information about the applicant's SSN from Experian. (*Id.*) Experian provides this

---

[1]     Experian disputes that the deposition testimony cited by Young "indicate[s] that Experian includes LADMF-related information within consumer credit files." (Def. Resp. to PSOF [152] ¶ 38.) Perhaps Young's citation could be clearer, but the court believes the testimony supports the conclusion. Young's counsel asked of the deponent: "theoretically, if the [SSA] started reporting today that a consumer's SSN was reported as deceased, if that consumer never contacts you and provides contrary evidence it will just stay in their file forever; is that correct?" The deponent responded:

> Well, unless the [SSA] makes a correction to their death master file then we would continue to receive that information that that number should be reported as deceased because that information is coming to us from the [SSA]. So unless they correct their records in your hypothetical, then, yes, it would continue to report that way because they're continuing to tell us that it belongs to a deceased individual.

(Methvin Dep. at 147:22–148:4.)

information to FADV using the Fraud Shield product.  (*Id.* ¶¶ 15–16, 28–29). [2]  Although FADV acquires consumer information from Experian and assembles it into background reports that it furnishes to Walmart, there is no evidence in the record that FADV saves the information that it gets from Experian in a database.  Rather, as explained below, it appears that each time FADV is asked to prepare a background report on a consumer, FADV submits a new request to Experian and then passes the information along to its client (in this case, Walmart).  For this reason, the court finds that FADV meets the definition of a "reseller" of consumer information under the FCRA. *See supra* at 2–3.  Without offering any specifics concerning the date or form of its communications with FADV, Experian asserts that it is "standard practice" for Experian to send clients like FADV a copy of the NTIS terms of use for the LADMF.  (DSOF ¶ 16 (citing Methvin Decl. [136-1] ¶ 17.))

The same day that Young completed his Walmart job application, April 19, 2022, FADV requested an SSNV from Experian about Young and provided Experian with Young's personal identifying information.  (PSOF ¶ 5.)  In response to this request, Experian ran a database query against the LADMF; the search result contained Young's full name, correct SSN, and correct date of birth, along with a date of death of December 18, 2021. [3]  (DSOF ¶¶ 25–26; Methvin Decl. ¶¶ 18-21.)  Experian provided FADV with that data, including Young's correct date of birth, his purported date of death (December 18, 2021), and a notation that read: "INQUIRY SSN RECORDED AS DECEASED."  (DSOF ¶ 6.)  No full copy of the Fraud Shield report from Experian

[2]      It is not clear from the record whether Plaintiff concedes that Experian in fact provides this information to FADV using Fraud Shield (*see* Pl. Resp. to DSOF [154] ¶¶ 15–16, 25–26), but in the court's view, there is no genuine dispute as to this fact.

[3]      Plaintiff disputes that Experian actually got this information from the LADMF but does not offer any evidence of his own to rebut the declaration of Mary Methvin that Experian relies on.  (Pl. Resp. to DSOF ¶¶ 25–26.)  Instead, Plaintiff seeks to generate a genuine issue of material fact by arguing that these propositions are supported by nothing more than "the self-serving, counsel-crafted declaration" of Methvin.  (*Id.*)  As Experian correctly points out, simply labeling "perfectly admissible evidence" as "self-serving" will not suffice to oppose it at summary judgment.  *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013).

to FADV appears in the record, and it is not clear whether the report provided the name of the holder of the SSN at issue.  At some point soon thereafter, FADV communicated the results of the SSNV to Walmart.  (PSOF ¶ 7.)  According to Young, a Walmart hiring manager later told him that the background report showed that Young's SSN had been flagged for fraud.  (*Id.* ¶ 8.)

Young testified at his deposition that during this conversation, the Walmart hiring manager also told him that he could not begin working because of the deceased notation. (Young Dep. [144-4] at 79:13–80:6; PSOF ¶ 8; Pl. Mem. at 2, 7.)  But as Experian observes (Def. Resp. to PSOF ¶ 8), Young's account of the hiring manager's statement is hearsay.  *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023).   Young has not presented admissible evidence that Walmart denied him employment because of the deceased notation reported by Experian via FADV. Nevertheless, and despite objecting to the admission of the Walmart hiring manager's statement, Experian has effectively accepted Young's assertion.  (*See* Def. Mem. [137] at 1 (stating that, "[u]nsurprisingly, Plaintiff's job application was put on ice after Walmart informed him that it had received information that Plaintiff's [SSN] had been recorded as deceased,"), and 6 (suggesting that "Plaintiff's status as a former self-described 'career criminal,' and related criminal record, posed a potentially insurmountable hurdle for passing a background check," but affirming that "Plaintiff's employment application stalled for another reason—Plaintiff's [SSN] was recorded as deceased by the SSA."))

Regardless of why Walmart decided not to hire Young, it is undisputed that Young—who had presumably learned that FADV was the source of the report—contacted FADV on May 3, 2022 to dispute the deceased notation.  (PSOF ¶ 9.)  FADV responded ten days later with a new SSNV that again included the deceased notation.  (*Id.*)

This was not the first time Young had been told that something was amiss with his SSN. In either December 2021 or January 2022, Young received two letters from the Illinois Department of Human Services stating that (1) the agency had learned Young was deceased and (2) Young should contact the SSA for more details.  (DSOF ¶ 20.)  Although he disposed of the letters he

received, Young eventually called the Illinois Department of Human Services (the date of this call is not in the record) in response to these letters and, he claims, was told by someone at the Department to contact the SSA.  (*Id.* ¶ 21.)

### D.    Young's May 31, 2022 Call to Experian

At some point, Young determined (the record does not say how) that Experian was the source of the deceased notation that FADV passed along to Walmart.  On May 31, 2022, Young contacted Experian by phone to dispute the notation; a recording of this phone call is in the record. (PSOF ¶ 10; *see generally* May 31 Phone Call [139].)  An Experian representative who identified herself over the phone as "Sarah" answered his call.  (May 31 Phone Call at 0:03–0:08.)  Young told Sarah that "he had applied for employment with Walmart, that Walmart obtained a background report from FADV, that the FADV background report contained a deceased notation, and that Walmart had informed him that his employment could not commence until the deceased notation issue had been resolved."  (PSOF ¶ 11.)  Young explained that he suspected he might have been the victim of identity fraud, and that the person who had been using his SSN had died. (May 31 Phone Call at 0:40–0:50.)

In response to questions from Sarah, Young provided his name, SSN, current mailing address, and date of birth.  (*Id.* at 1:00–3:00.)  When asked how he knew that another person who had used his SSN had died, Young stated that he had been working at a gas station five or six months earlier; when he had applied to work there, the HR manager told him that there was a "discrepancy with his social death."  (*Id.* at 10:08–10:35.)  Young then explained that he got a letter in the mail from "the welfare office" (presumably, the Illinois Department of Human Services) stating that they wanted copies of his death certificate; at first, Young thought it might be a scam and discarded the letter, but when he received another copy of that letter (in December 2021 or January 2022), he began to take it seriously.  (*Id.* at 10:36–10:57; Pl. Resp. to DSOF ¶ 20.)  No copy of this letter appears in the record.

Young relayed to Sarah that when he called the welfare office, he learned that a man by the name of Shane Young had recently passed away in the Springfield, Illinois area, and that this other Shane Young's funeral services had been held at a funeral parlor called Serenity Memorial Funeral Chapel in Bellevue, Illinois. (May 31 Phone Call at 10:52–11:30.) Plaintiff went on to explain that he had asked the welfare office to give him the other Shane Young's SSN; the office had told him they could not do this but confirmed that the wife of the other Shane Young had given them the same SSN that Plaintiff claimed as his own. (*Id.* at 11:31–12:00.)

Sarah also was able to confirm that Plaintiff's Experian file appeared to be "mixed" with the file of the other Shane Young—that is, the information of both men was appearing in a single Experian file. (*Id.* at 14:21–15:11.) Sarah told Plaintiff that she would be able to remove the other Shane Young's information from Plaintiff's file but that it would take 24 to 72 hours before the changes were reflected in Experian's records. (*Id.* at 16:43–17:00, 18:40–18:47.) As Sarah told Plaintiff later in the same phone call, the other Shane Young apparently had an SSN that differed from Plaintiff's by one digit. (*Id.* at 40:30–41:00.)

Although she had initially seen no indication that Plaintiff had been reported as deceased, Sarah was eventually able to confirm, while still on the phone with Plaintiff, that Experian had received a notification from the SSA to this effect. (*Id.* at 15:11–15:24, 30:50–31:17; PSOF ¶¶ 12–13.) (During the call, Sarah used the term deceased "notification" interchangeably with deceased "notation.") Young told Sarah that he had called his local SSA office in Freeport, Illinois, and had been assured that "there's nothing registered to me and my social that I gave you, that shows up anything that is any kind of red flag, discrepancy or otherwise." (May 31 Phone Call at 31:30–31:52; *see also* PSOF ¶ 13.) Sarah explained that "when we unmix a file, we can see what items belong to you and what items belong to the other consumer." (May 31 Phone Call 32:08–32:22.) She explained, further, that "this item showing you as deceased should belong to the other consumer," but noted that "the system is not showing me if that information will be also—get removed with the other consumer's information." (*Id.* at 32:22–32:35, 35:15–36:10.)

11

Then, after conferring with her supervisor, Sarah suggested a remedy:

I was just talking to my supervisor and, even though—she recommend you, if you could maybe contact the Social Security Administration and tell them if there is a way that they can send you some kind of letter, like proof, like showing that what they told you over the phone, that you are not deceased, that they are reporting everything fine about you. They should have any kind of letter for the scenarios like that. Because this happens sometimes.

(*Id.* at 36:20–36:53.) Young responded that he had "tried doing that about two weeks ago" but had been rebuffed over the phone by a woman at the SSA who got "pissed off" at Young and insisted that there was "no discrepancy." (*Id.* at 36:55–37:31.) Sarah responded:

I'm so sorry. My recommendation, sir, is the next. If you give them a call, just tell them something—just tell them: hey, you have been reporting me as deceased through Experian, and I don't know, maybe through the other bureaus, hopefully not. But you have been reporting me as deceased. I already contacted Experian, and they told me that I need to give you a call and you have to send me some kind of proof showing that I'm not deceased, so—only so they will be able to remove the deceased notification.

(*Id.* at 37:57–38:30.)

Plaintiff responded by asking, "If I get that information from them, if I can actually obtain any of that kind of information, how do I submit it to you guys so that you guys have it?" (*Id.* at 38:35–38:44.) Sarah then provided Plaintiff with a website address where Plaintiff could upload the documentation ("Experian.com/upload") and continued:

If they send you some kind of letter or something, please send us the letter there together with something to prove your identity: driver's license, state ID, social security card, passport, anything. And you can also add a note there—please add a note, this is my recommendation, saying "this is the proof showing I'm not deceased. Please remove the deceased notification from my report." Just that.

(*Id.* at 39:00–40:04.)

Although Sarah later reiterated her suspicion that the deceased notation had appeared in Plaintiff's Experian file because the SSA had reported the *other* Shane Young as deceased, she clarified that there was no way for her to know this was the case. (*See id.* at 41:52–41:57.) Plaintiff asked: "so there should be no red flag on my credit report anymore on that regard, correct?" to which Sarah responded:

> Not about a mixed issue. The only thing will be related to the deceased issue. That there is no way for me to know if maybe somehow the Social Security Administration just reported—but it makes sense if maybe just they reported the other consumer as deceased, and because you were sharing the same file, it was on your file, because you were sharing the file.

(*Id.* at 42:08–42:44.)

Young now admits that he understood the directions that Sarah had given him to resolve the deceased notation issue. (Pl. Resp. to DSOF ¶ 38.) He maintains, however, that Sarah did not make clear that he *needed* to take these steps in order to have the deceased notation removed. (*Id.* ¶¶ 34–35.) And as Young points out, Mary Methvin, Senior Compliance and Litigation Analyst at Experian, later testified that, in her view, Sarah "could have handled the call better" and that "maybe she should have been more firm in explaining to him that he absolutely needed to go to the Social Security Administration to correct this error or correct this reporting." (*Id.*; Methvin Dep. at 177:5–12.)

### E. Events Following the May 31, 2022 Call

Whatever doubts he may have had about next steps, it is undisputed that Young did visit the SSA office in Freeport, Illinois on June 2, 2022. (PSOF ¶ 19.) After he presented identification, an SSA employee (unnamed in the record) told him that the SSA's records contained no indication that Young was deceased and confirmed this in a letter. (*Id.*) Experian objects to the admission of the letter on hearsay grounds, and the court notes its own concerns about authenticity. *See* FED. R. EVID. 803(8)(B). The letter contains several typos and grammatical errors within a half-page of text and, perhaps more importantly, is not signed by any particular SSA employee but instead with the words "Social Security Administration" in a cursive typeface. (*See* [144-13].)

Whether or not the letter is authentic, it is undisputed that Young never uploaded it or any other documentation to the Experian website, despite the fact that he understood what documents Experian had requested him to provide. (DSOF ¶¶ 36–39.) His reasons for refusing to do so are disputed: Young asserts he did not understand how uploading the documents would make a

difference, given that he had already called Experian, and claimed he "didn't want to give them any more information to mess that up too because it's the only documents I had, so if I give them that and they lose that, then I'm right back to where I started."[4] (Young Dep. at 221:16–20.) In Experian's view, Young refused to upload the documents because Young was fed up with Experian, and did not want to do anything to help Experian straighten things out. (*See* DSOF ¶¶ 38–39; Young Dep. at 221:15, 221:21–23 (Young testifying that he thought Experian "did a shit job," that he "didn't want to give them anything to supposedly help them do their job," and that he "hope[s] they wipe their ass better than that.")) Apart from refusing to upload the documents as requested, Young also never filed a written statement of dispute regarding the deceased notation before initiating this lawsuit on June 22, 2022.

On June 8, 2022, Young again contacted FADV to dispute their background check. (PSOF ¶ 20.) On June 21, 2022, FADV called Young and asked him to send FADV a copy of his driver's license and Social Security card, which Young did that same day. (*Id.* ¶ 21.) Matthew O'Connor, Vice President of Operations at FADV, stated the following in a sworn declaration:

> On June 22, 2022, after Mr. Young sent First Advantage a copy of his Social Security card and driver's license, First Advantage logged into Experian's portal for reseller reinvestigations at https://ss1.experian.com/securecontrol/logon.html, and initiated a dispute of Experian's reporting on Mr. Young. First Advantage provided Mr. Young's personal identifying information to Experian, and Experian then displayed Mr. Young's credit header information to First Advantage. First Advantage reviewed the information and selected the deceased notation as being disputed.

(O'Connor Decl. [144-2] ¶ 12.) O'Connor's declaration is attached to Young's Local Rule 56.1 Statement of Undisputed Material Facts. Young did not make specific mention of Mr. O'Connor's declaration in that Statement, so it is not clear whether the facts stated in it are disputed. Nor is it clear whether FADV included copies of Young's Social Security card and driver's license in the

---

[4] It is not clear how Young believed Experian could "mess up" if he provided the requested documents, and even less clear how Young would have arrived at the conclusion that he was being asked to provide the original of the documents in question, rather than uploading electronic copies to the portal, such that Experian somehow "losing" them would be a concern.

online dispute form, or instead simply provided Young's name, SSN, and date of birth. What is clear is that Young did not wait for a further response from Experian before filing this lawsuit on June 22, 2022, against both Experian and FADV. (*See generally* Compl. [1].) Young has since reached a settlement with FADV (*see* [50] (entering dismissal of FADV pursuant to the parties' stipulation [49])), but asserts claims against Experian under § 1681e(b) (failure to follow reasonable procedures) and under § 1681i(a) (failure to conduct a reasonable reinvestigation). (Am. Compl. [120] ¶¶ 79–104.)

In his initial complaint, Young brought only a § 1681e(b) "reasonable procedures" claim against Experian. (*See* Compl. ¶¶ 74–101.) But on November 27, 2023, Young moved for leave to file a supplemental pleading, which the Magistrate Judge granted over Experian's objection, reasoning that Young had good cause to supplement because he had only discovered the factual basis for a § 1681i "reasonable reinvestigation" claim against Experian during discovery in this matter. (*See* [102], [119].) Young filed his amended complaint on February 6, 2024, describing events that took place after the original complaint was filed but occurred within 30 days of Young initiating his dispute with Experian and are thus relevant to Young's "reasonable reinvestigation" claim. (*See generally* Am. Compl.)

Young asserts that on June 24, 2022, an FADV employee named Maria Roberson contacted Experian's client services department by phone concerning Young's dispute, that an Experian employee named "Jeff" told Roberson that he was "not getting the deceased alert," and that Experian (presumably, through this "Jeff") had instructed FADV to rerun the SSNV.[5] (PSOF ¶ 22.) Experian disputes these assertions, but it is not clear whether it disputes them in part or in whole; Experian merely notes that its "client services department does not provide assistance

---

[5]     It does not appear that Roberson herself was deposed or gave a declaration in this case. Young instead relies on Roberson's emails and contemporaneous notes made by Roberson in FADV's consumer dispute management system; these documents would presumably be authenticated by Matthew O'Connor, the FADV VP who *has* submitted a declaration. (*See* [144-14].)

with consumer disputes." (Def. Resp. to PSOF ¶ 22.) The parties agree, though, that on June 28, 2022, FADV requested another SSNV from Experian concerning Young, and that Experian again returned a deceased notification. (*Id.* ¶ 23.)

According to Young, Roberson contacted Experian client services again on July 6, 2022 and spoke to someone named "Raymond" regarding Young's file. (PSOF ¶ 24.) "Raymond" told Roberson that he had "found [a] couple of issues with [Young's] file" and would "request" permission (he did not say from whom) "to fix" the file. (*Id.*) Young asserts that his Experian file "was accessed or viewed by Experian five times on July 6, 2022." (*Id.*) That same day, Raymond Alvarado, an Experian employee, asked Roberson via email to confirm that she had called Experian and, once she did so, reported to Roberson that "the credit report of Shane Young has been corrected." (*Id.* ¶ 25.) Again, Experian disputes these assertions on the basis that "Experian's client services department does not provide assistance with consumer disputes" (Def. Resp. to PSOF ¶¶ 24–25), but as with respect to the events of June 28, the parties agree that FADV requested an SSNV for Young once more on July 6, 2022 and that Experian once again returned a deceased notation. (*Id.* ¶ 26.)

## **LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion*." Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

## DISCUSSION

### I.     Accuracy of Experian's Report

A "threshold requirement" for FCRA claims under both § 1681e(b) and § 1681i(a) "is that there must be an inaccuracy in the consumer's credit report." *Chuluunbat v. Experian Info. Sols., Inc.,* 4 F.4th 562, 567 (7th Cir. 2021). As the Seventh Circuit has explained, "an item on a credit report can be incomplete or inaccurate within the meaning of the FCRA because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Frazier v. Equifax Info. Servs., LLC*, 112 F.4th 451, 455 (7th Cir. 2024) (internal citations omitted); *see also Chaitoff*, 79 F.4th at 812 (consumer report may be "technically correct" or "technically accurate" but nonetheless run afoul of § 1681e(b) and § 1681i(a)).

The record here supports a finding that the Experian report provided to FADV regarding Young was materially misleading. Young is alive and has a valid SSN. Information that he was using the SSN of a dead person could suggest that Young was guilty of identity fraud. Experian contends that, under *Chaitoff v. Experian Info. Sols., Inc.*, a report only violates the "materially misleading standard" if it "omits accurate information that could reasonably be expected" to adversely affect the consumer. (Experian Reply [163] at 6–7 (quoting 79 F.4th at 812).) Thus, Experian contends, because Young has not proposed any "language that Experian should have added" when informing FADV that Young's SSN had been recorded as deceased, the consumer report could not have been materially misleading. (Experian Reply at 7.)

The court does not read *Chaitoff* to hold that a consumer may establish that a report is technically accurate but "materially misleading" only by demonstrating the omission of a particular datapoint.[6] But even if that were the case, it is undisputed that Experian's report *did* omit a critical

---

[6]      It is true that the plaintiff in *Chaitoff* argued the report at issue was misleading by omission. *See* 79 F.4th at 809–10. But in *Chaitoff*, the Seventh Circuit adopted the "materially misleading" standard from another of its recent cases interpreting the reporting responsibilities of

piece of information: that Young was the legitimate holder of the SSN he listed on his background check. Experian might protest that it could not have known this before Young disputed the report, but the CRA's ability to discover the material omission would be relevant to the question of whether the CRA acted reasonably—not whether the consumer report itself is "inaccurate" within the meaning of the statute. *See Chaitoff*, 79 F. 4th at 813, 816 (Experian's omission of a critical datapoint made its reporting inaccurate, despite the fact that, from Experian's vantage, the datapoint "was an unknown unknown"; court found, however, that Experian's initial reporting was "reasonable beyond dispute.")

In support of its argument that its reporting in this case was accurate and cannot form the basis for liability, Experian also cites *Mijne v. Experian Info. Sols., Inc.*, No. 23 C 22694, 2024 WL 1655475 (S.D. Fla. Apr. 17, 2024), which Experian describes as "another case involving the [Fraud Shield] product." (*See* Def. Mem. at 13–14.) The court does not find that case persuasive on this issue. In *Mijne*, the plaintiff had applied for a credit card with Wells Fargo Bank, furnishing his name, address, and SSN as part of his application. *Mijne*, 2024 WL 1655475 at *1. Wells Fargo provided the plaintiff's information to Experian but somehow botched the plaintiff's SSN, reporting a number that was two digits off from the correct one. *Id.* Experian ran the provided SSN against the LADMF, found that the number was associated with a person recorded as deceased, and reported a deceased notation back to Wells Fargo via the Fraud Shield product, along with a note that there was a "high probability" that the SSN belonged to a person other than the plaintiff. *Id.* at 2 & n. 4. The plaintiff sued Experian under § 1681e(b), alleging that Experian had failed to follow reasonable procedures in its reporting. *Id.* at *4.

---

"furnishers" (i.e., lenders or creditors) under § 1681s-2 of the FCRA. 79 F.4th at 812. And in the furnisher case, *Frazier v. Dovenmuehle Mortgage, Inc.*, the Seventh Circuit had held that a consumer could show "incompleteness or inaccuracy" in a furnisher's reporting if the information provided was "(1) patently incorrect, or (2) materially misleading, *including by* omission." 72 F.4th 769, 776 (7th Cir. 2023) (emphasis added). Indeed, it would be odd if, as a matter of law, a consumer report could be misleading *only* by omission.

The *Mijne* court concluded that Experian's report to Wells Fargo was accurate as a matter of law and granted summary judgment in favor of Experian. *Id.* at *5–6. As in this case, the Experian report was technically accurate: Experian merely reported through Fraud Shield the information from the LADMF associated with the SSN Experian had received. *See id.* at *6. The *Mijne* court reasoned that "the report suggested only that the application contained the wrong social security number and Wells Fargo may wish to investigate the applicant further." *Id.* As such, the court concluded, "'[a] reasonable user of the report standing in the shoes of' Wells Fargo would not be misled into thinking otherwise." *Id.*

The *Mijne* court opined that Experian's reporting of the deceased notation as an indicator of fraud via the Fraud Shield product was not relevant to the accuracy inquiry. *See id.* at *2 n. 4. This court respectfully disagrees. In this court's view, reporting a deceased notation as an "indicator" or "warning sign" of fraud could well suggest to a reasonable user of the report that the applicant might be untrustworthy, such that reporting the notation when the applicant is not actually deceased would be misleading and thus inaccurate within the meaning of the FCRA, even if the reporting is technically accurate.[7]

## II.    Reasonable Procedures

"Even when inaccurate information makes its way into a credit report, a CRA's liability under both § 1681e(b) and § 1681i(a) turns on whether [the] CRA acted reasonably." *Chaitoff*, 79 F.4th at 816. § 1681e(b) asks whether the CRA adopted "reasonable procedures to assure maximum possible accuracy." *Id.* The inquiry turns on "balancing the costs of a marginal return to accuracy against the potential harm to consumers from declining to incur those costs." *Id.* This

---

[7]    Experian highlights the fact that, in Young's case, it did *not* report to FADV that there was a high probability that the SSN Young provided belonged to another person. (Def. Mem. at 14 n. 5.) But Experian points to no evidence in the record that would establish that a reasonable Fraud Shield user would only conclude that an applicant might be committing identity fraud if the user received that additional notation.

is "normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question." *Id.*

It is important to recall that the § 1681e(b) inquiry concerns the steps the CRA takes *before* consumers dispute the accuracy or completeness of the report; the matter of the CRA's reasonableness in responding *after* a consumer has pointed out an inaccuracy is considered under the "reasonable reinvestigation" provision, § 1681(i)(a). *See supra* at p. 1–2; *see also Chaitoff*, 79 F.4th at 817 (a CRA "that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice.")

The Seventh Circuit has long acknowledged that some sources of information are sufficiently trustworthy that CRAs are initially entitled to rely on them as a matter of law. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994) (holding that a CRA "is not liable under the FCRA for reporting inaccurate information obtained from a court's Judgment Docket, absent prior notice from the consumer that the information may be inaccurate"); *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004) (extending the logic of *Henson* to "records from financial institutions"); *Chaitoff*, 79 F.4th at 816–17 (reasonable for CRA to trust a mortgage lender where the lender was "a major financial institution, and Experian regularly relie[d] on its reporting.") As the *Henson* court explained, a contrary rule would require CRAs "to engage in background research which would substantially increase the cost of their services," which in turn would force the CRAs "to pass on the increased costs to their customers and ultimately to the individual consumer." 29 F.3d at 285. To be sure, if a source of information is shown to suffer from "systemic problems," it should not be treated as presumptively reliable. *Chaitoff*, 79 F.4th at 817. But if reliance on the source is "unlikely to lead to inaccurate credit reporting except in isolated instances," that reliance is likely, at least initially, to be reasonable. *Henson*, 29 F.3d at 285.

Like the court docket relied on in *Henson*, the LADMF is a government record, produced by two organs of the federal bureaucracy working in tandem: NTIS and the SSA. And while NTIS

acknowledges that the LADMF systematically underreports deaths, the bureau maintains that the records of a person who is *not* deceased will be included erroneously in the LADMF only in "rare instances."

Plaintiff contends that the LADMF is "unreliable as a whole" because neither the SSA nor NTIS "guarantee" its accuracy. (Pl. Mem. at 10.) But Plaintiff fails to grasp that it can be reasonable for a CRA to rely on a source of information even if everyone agrees that the source contains some errors. As explained above, the reasonableness of relying on the source must be determined by reference to the prevalence or frequency of those errors, and the costs of detecting the errors prior to issuing a consumer report.

Plaintiff makes no attempt to grapple with those issues.[8] Instead, he insists that "had Experian employed a similar procedure to the 'deceased scrub' in cases where the SSA reports a deceased notification, it would have observed that despite reporting a date of death for Plaintiff, Experian continued to receive inquiries from FADV related to Plaintiff's employment applications." (Pl. Mem. at 14.) But this is just another way of arguing that Experian was not entitled to rely on the LADMF at all. Presumably, Experian uses the "deceased scrub" to automatically clear out deceased notations that come from tradelines because tradelines are not a reliable source of information concerning a consumer's deceased status. The LADMF is a generally reliable source of deceased notations as far as the FCRA is concerned—again, the undisputed evidence in the record is that the database incorrectly lists someone as deceased only "rarely." Experian could thus reasonably view credit inquiries popping up on a consumer's file after his SSA recorded date

---

[8]     Plaintiff also claims that the LADMF is unreliable because it is "meant to be used by the SSA to monitor the payment of Social Security benefits" and was not "created or intended to be a reliable source for CRAs," citing the report of a claimed expert. (Pl. Mem. at 10.) But assuming this is true, Plaintiff fails to explain why a database of death records intended for one use by the SSA could not be a reliable source of information for CRAs in this context: the question remains how likely the database is to contain errors. In any event, regardless of why the LADMF was originally created, today the NTIS clearly does intend that the database will be used for fraud prevention purposes by Subscribers. *See supra* at p. 2–3.

of death as a warning sign of identity theft, rather than confirmation that the consumer is, in fact, alive.

Experian's initial reliance on the LADMF as a source of deceased notations was reasonable as a matter of law, and Young's claim under § 1681e(b) must fail.

## III.  Reasonable Reinvestigation

Reasonableness is a matter of costs and benefits, and when a CRA receives notice of a potential inaccuracy in its initial reporting, "it can target its resources in a more efficient manner and conduct a more thorough investigation."  *Chaitoff*, 79 F.4th at 817 (quoting *Henson*, 29 F.3d at 286–87).  "Thus, reasonable procedures under § 1681e(b) are not proof of a reasonable reinvestigation under § 1681i(b)."  *Chaitoff*, 79 F.4th at 817 (internal citations omitted).

"The reasonableness of a CRA's reinvestigation is a question for the jury unless reasonableness is beyond dispute."  *Id.* at 819.  Although the Seventh Circuit in *Chaitoff* was careful to note that it "establish[ed] no hard and fast rules about what is or isn't a reasonable reinvestigation" (*id.*), the court did hold that summary judgment in favor of the CRA on this issue is inappropriate if the jury could find that the CRA "could have taken another cost-effective step that would have discovered" the existence of omitted information or otherwise "might have resolved the dispute."  *Id.* at 808, 818.

In this case, the dispute was, essentially, whether Plaintiff was potentially an identity thief using a deceased person's SSN, or whether Plaintiff was the legitimate holder of the SSN he was using.  As explained above, Experian initially had valid grounds to believe that the former might be the case.  In response to Young's call on May 31, 2022, Experian asked Young to upload to its website a letter from the SSA and a form of government-issued ID proving that he was who he said he was and that the LADMF data on him was an error.

Young argues that, by asking him to submit such documents, Experian improperly shifted the burden of reinvestigation onto him, such that *he* is entitled to summary judgment on this issue.  (*See* Pl. Mem. at 15–16.)  It is true that the "obligation to reinvestigate" is a "dut[y] on the part of

a reporting agency." *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 607 (7th Cir. 2005) (internal citations omitted); *see also Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993) ("The statute places the burden of investigation squarely on" the CRA.) But it does not follow that a CRA may not ask a consumer to submit any documentation before the CRA investigates the consumer's dispute. Indeed, the FCRA contemplates that a CRA might need to do so in some cases. *See, e.g., Ingram v. Experian Info. Sols., Inc.*, 83 F.4th 231, 243 (3d Cir. 2023) ("Under Section 1681i(a)(3)(A), the agency is permitted to request additional information from the consumer, where necessary, before completing its own investigation").

Young also cites *Miller v. Westlake Servs. LLC*, 637 F. Supp. 3d 836 (C.D. Cal. 2022) in arguing that it was per se improper for Experian to request documents from him to investigate his dispute. (*See* Pl. Mem. at 17.) *Miller*, of course, is not binding and in any event is clearly distinguishable. Plaintiff there believed she had been the victim of identity theft and asked the defendant CRA to stop reporting an account on her credit file that she claimed was fraudulently opened. 637 F. Supp 3d at 841–42. At the time Miller contacted the defendant, it was already in possession of at least six letters the plaintiff had previously written to other CRAs regarding the issue, each of them containing copies of the plaintiff's Social Security card, driver's license, and a letter confirming her mailing address. *Id.* at 850. Some of the letters stated that she had filed reports with her local police department and with the Federal Trade Commission and included the identification numbers for those reports. *Id.* One letter even included cover pages of the police reports and contact information for police officers willing to discuss the reports. *Id.*

Despite that trove of information tending to show that the plaintiff was who she said she was, the defendant in *Miller* insisted it had no duty to adjust its reporting or investigate further because plaintiff had not complied with defendant's request for full copies of the police report and a separate affidavit of identity theft. *Id.* at 851. The defendant's refusal to act without the additional documents, the Miller court concluded, breached the duty of "reasonable

reinvestigation" created by the FCRA; but the court did not suggest it is per se improper for a CRA to request any documentation from a consumer in the course of an investigation.

Here, it was reasonable for Experian to ask Young to prove that he was who he said he was by uploading identifying documents. Tellingly, Young has failed to propose any alternative, cost-effective step that Experian could have taken to verify his identity—rather, Young's position seems to be that Experian should have taken his word for it based on his May 31, 2022 phone call and deleted the deceased notation accordingly. In fairness to Young, he did provide quite a bit of personal detail to the Experian representative he spoke with. But acquiring and using another person's private information is exactly what identity thieves do. The court will not fault Experian for asking Young to upload documentation proving his identity.

That conclusion does not end the "reasonable reinvestigation" inquiry, however. Recall that under the FCRA, the consumer's initial notification of dispute creates a 30-day window within which the CRA is required to either record the status of the information as disputed or delete the information if it is found to be inaccurate. *See supra* at p. 2. If, during that 30-day window, the CRA receives additional information relevant to the dispute, the reinvestigation period may be extended for another 15 days. *Id.* The record is unclear about whether Experian received additional, relevant information from Young—via reseller FADV—within the 30-day window following Young's May 31, 2022 phone call.[9] It is undisputed that on June 21, 2022, FADV requested that Young send them a copy of his driver's license and Social Security card, and that Young did so the same day. According to FADV, the following day it initiated a dispute of Young's deceased notation via an online portal maintained by Experian, and in doing so, "provided Mr.

---

[9] Young claims that the phone calls FADV made to Experian on his behalf were "each separately sufficient to trigger Experian's obligations to reinvestigate" under § 1681i(a). (Pl. Mem. at 20.) To the extent that Young means that each communication from FADV regarding Young's deceased notation was a new dispute creating its own 30-day window to respond, the court disagrees. Young has not cited any provision of the statute or any court decision to support that reading of the FCRA.

Young's personal identifying information to Experian." This statement is ambiguous: in context, it could mean that FADV passed along the copies of Young's driver's license and Social Security card it had received the following day, or it could mean that FADV simply input datapoints like Young's name and SSN.

If FADV in fact passed along copies of Young's license and Social Security card to Experian on June 22, 2022, a jury could find that Experian breached its duty to reasonably reinvestigate, given that it failed to correct its reporting on him thereafter. Experian might argue that NTIS policy required it to ask Young to obtain and submit a letter from the SSA on top of his government-issued ID—but recall that the policy also specifically states that CRAs should accept *either* a copy of the SSA letter *or* the individual's "own records" as sufficient proof to correct the CRA's local copy of the LADMF. Further, if NTIS policy did require Experian to secure both letter and ID before updating its local copy of the LADMF, Experian has not explained why it could not adjust its own reporting. After all, Experian "controls the information it places on a consumer's credit report"— or in this case, a Fraud Shield report. *Cortez v. Trans Union, LLC*, 617 F.3d 688, 713 (3d Cir. 2010). There is no evidence that NTIS prohibits Experian from reporting anything other than what is reflected on the LADMF.

## IV.    Willfulness

That leaves the question of willfulness; a willful violation of the FCRA could result in an award of punitive damages. But the court agrees with Experian that it is entitled to summary judgment on this question. (*See* Def. Mem. at 18–19.)

A willful violation of the FCRA is one committed knowingly or with "reckless disregard" of the CRA's statutory duty. *Chaitoff*, 79 F.4th at 819 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)). Reckless conduct is conduct that creates a risk "substantially greater" than necessary to establish negligence. *Chaitoff*, 79 F.4th at 819 (citing *Safeco*, 551 U.S. at 69); *see also Safeco*, 551 U.S. at 69 (quoting Restatement (Second) of Torts § 500 (reading into the FCRA

the common law understanding that recklessness requires "a known or obvious risk that was so great as to make it highly probable that harm would follow."))

It is not clear that the willfulness of an FCRA violation must be decided as a question of law under Seventh Circuit precedent. *See Jeffers v. First Nat'l Bank of Omaha*, 679 F. Supp. 3d 757, 761–63 (C.D. Ill. 2023) (collecting cases). It is plain enough, however, that courts *may* decide the issue. *See Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486, 490–91 (7th Cir. 2012) (acknowledging that in *Safeco*, the Supreme Court "treated willfulness as a question of law and directed that judgment be entered in a defendant's favor without a trial.") As described above, it is not clear to the court that Experian violated the statute at all, but if there was a violation, Experian's conduct was not knowing or reckless. Young contends that Experian "unquestionably knew" since at least May 31, 2022 that its inaccurate reporting was harming him (Pl. Mem. at 20–21), but has not pointed to a single piece of evidence that shows Experian knew by May 31 that the LADMF deceased notation for Young was incorrect. Young simply points to the fact that he disputed the notation on that date—as the court has explained, Experian's response to the May 31, 2022 call was reasonable, and cannot support liability, much less a finding of recklessness.

Young also claims that Experian acted willfully in that it failed to change its reporting on him for several months after he filed a lawsuit and had "been on notice since at least 1993 that procedures like the one employed here—which consist of nothing more than attempting to shift Experian's statutory duty on to the consumer—are violative of the FCRA." (Pl. Mem. at 21–22 (citing *Stevenson*, 982 F.3d at 293).) As explained above, however, it is not necessarily improper for a CRA to request information or documents from a consumer to aid in the investigation of a dispute. And Young's own unexplained failure to comply with Experian's reasonable request for documentation before filing this lawsuit undermines his claim that it was Experian who acted recklessly, particularly in light of the fact that he provided such information several days later when FADV requested it. The court notes, too, that Young did not bother to file a written statement of

dispute with Experian, which would have required Experian to note Young's dispute in its reporting under § 1681i(b).

Any violation of the FCRA on Experian's part was negligent and not willful. As such, if successful at trial, Young would only be entitled to recover his actual damages, costs, and fees.

## V.    Causation

Finally, the court recognizes that to bring a successful claim for a negligent violation of the FCRA, a consumer must "show that she suffered injury as a result of any inaccurate information." *Aldaco v. RentGrow, Inc.*, 921 F.3d 685, 689 (7th Cir. 2019). Experian argues that both FADV's "improper" use of the Fraud Shield product to (effectively) deny Young employment and Young's refusal to upload his documents to the Experian website were "intervening" or superseding causes that "severed" the causal link between Experian's conduct and Young's claimed injuries. Causation is "typically a question for the jury," *Hakim v. Safariland*, LLC, 79 F.4th 861, 872 (7th Cir. 2023), and the court declines to grant summary judgment on this basis.[10]

The only case Experian cites on the issue is distinguishable. In *Tinsley v. TRW Inc.*, the plaintiff had "sent letters to [TRW and Equifax] advising that they had erroneously merged his and his father's credit accounts." 879 F. Supp. 550, 551 (D. Md.), *aff'd*, 64 F.3d 659 (4th Cir. 1995). Tinsley's letter, however, "did not identify specific errors" in the defendant CRAs' reporting, so "TRW and Equifax sent him updated credit reports and requested that he particularize all information in error." *Id.* The evidence showed that Tinsley never responded before filing suit. *Id.* The *Tinsley* court granted summary judgment to the defendants, reasoning that Tinsley never got beyond "an allegation of inaccuracy": the defendants had presented "uncontradicted

---

[10]    Experian also suggests that Young may not have Article III standing in this case because his claimed injuries were "entirely self-inflicted" and resulted "solely" from his own conduct. (Def. Mem. at 22 (quoting *Parvati Corp. v. City of Oak Forest, Ill.*, 640 F.3d 512, 517–518 (7th Cir. 2020)).) Young certainly appears to have played a role in his own troubles, but it is plainly false that the situation was entirely of Young's own making: there is no question that Young was erroneously reported as deceased to the SSA and that the deceased notation was reported out by Experian.

evidence" of the procedures they used to assure maximum possible accuracy, and Tinsley had "not troubled himself to show in any respect that these procedures breached any standard of reasonable care much less were willfully or maliciously contrived." *Id.* at 552. The court also mused that Tinsley's "own failure to specify or follow up on claimed errors" broke "any chain of causation as far as negligent or willful acts" on the part of the defendants. *Id.*

It is not clear to this court that *Tinsley* was actually decided on causation grounds; the court concluded there was no breach of the FCRA to begin with. That said, *Tinsley* is akin to this case in that Young, like the plaintiff in *Tinsley*, did not provide information that Experian requested (copies of his driver's license and Social Security card) before filing his lawsuit. But there is a genuine dispute about whether FADV provided these documents to Experian; and Young only added his reinvestigation claim after he furnished them to FADV. It is nevertheless troubling that a dispute that could and should readily have been resolved has generated lengthy briefing. As Young himself bears significant responsibility for this, his damages may be limited.

## CONCLUSION

For the reasons explained above, Experian's motion for summary judgment [135] is granted with respect to Young's "reasonable procedures" claim under § 1681e(b) of the FCRA, and Experian's motion is denied with respect to Young's "reasonable reinvestigation" claim under § 1681i(a). Young's motion for partial summary judgment [143] is denied. As Young himself appears to have played a role in his alleged injury, he may not be entitled to any meaningful damages award. The parties are encouraged to discuss settlement.

ENTER:

Dated:  March 31, 2025

_____
REBECCA R. PALLMEYER
United States District Judge